Matter of Benjamin OO. v Latasha OO. (2019 NY Slip Op 02187)





Matter of Benjamin OO. v Latasha OO.


2019 NY Slip Op 02187


Decided on March 21, 2019


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: March 21, 2019

526491

[*1]In the Matter of BENJAMIN OO., Appellant,
v
LATASHA OO., Respondent.

Calendar Date: January 10, 2019

Before: Garry, P.J., Egan Jr., Aarons, Rumsey and Pritzker, JJ.


Lisa K. Miller, McGraw, for appellant.
Karen A. Leahy, Cortland, for respondent.
Larisa Obolensky, Delhi, attorney for the children.



MEMORANDUM AND ORDER
Egan Jr., J.
Appeal from an order of the Family Court of Delaware County (Rosa, J.), entered March 8, 2018, which partially granted petitioner's application, in a proceeding pursuant to Family Ct Act article 6, for an order of visitation.
Petitioner (hereinafter the father) and respondent (hereinafter the mother) are the married parents of two children (born in 2010 and 2011). The father lived with the mother and the children until he was arrested and subsequently convicted of three counts of criminal sale of a controlled substance in the fourth degree and sentenced to an aggregate term of 12 years in prison. From May 2013 through May 2016, the mother and the children visited the father in prison several times a month, and the father spoke with the children by telephone on a daily basis. In May 2016, the mother stopped bringing the children to visit the father and stopped taking the father's telephone calls. Thereafter, in July 2016, the father filed a petition seeking visitation with the children. In March 2018, following a fact-finding hearing and Lincoln hearings with both children,[FN1] Family Court granted the father's petition by awarding him visitation with the children twice per year — once in April and once in October — with weekly telephone contact with the children each Wednesday. The father appeals.
The father's sole contention on appeal is that Family Court erred by not specifically considering the quantity or frequency of visitation with him that would be in the best interests of the children prior to limiting his visitation with the children to just two visits each year — a total of four hours — while he remains in prison. Indeed, it is well settled that visitation with a [*2]noncustodial, incarcerated parent is presumed to be in the best interests of the children (see Matter of Granger v Misercola, 21 NY3d 86, 91 [2013]; Matter of Dharamshot v Surita, 150 AD3d 1436, 1437 [2017]; Matter of Robert SS. v Ashley TT., 143 AD3d 1193, 1193 [2016]). As relevant here, in determining the appropriateness of the frequency of visitation between the children and the incarcerated parent, the court must consider the totality of the circumstances, including such factors as "the age of the child[ren], the lack or existence of a meaningful relationship between the parent and the child[ren], the distance and travel time entailed, and the length of the parent's prison sentence" (Matter of Duane FF. [Harley GG.], 135 AD3d 1093, 1095 [2016], lv denied 27 NY3d 904 [2016]; see Matter of Lapham v Senecal, 125 AD3d 1210, 1210 [2015]). Ultimately, "[t]he propriety of visitation is left to the sound discretion of Family Court, guided by the best interests of the child[ren], and its decision will not be disturbed where it is supported by a sound and substantial basis in the record" (Matter of Dharamshot v Surita, 150 AD3d at 1437 [internal quotation marks and citations omitted]; see Matter of Kari CC. v Martin DD., 148 AD3d 1246, 1248 [2017]).
Initially, the father correctly notes that Family Court failed to make any factual findings in the subject order with regard to whether a biannual visitation schedule was in the best interests of the children. However, given that this Court's fact-finding authority in visitation matters is as broad as Family Court's, upon examination of the record before us, we may reach an independent determination on that issue (see Matter of Austin v Smith, 144 AD3d 1467, 1470 [2016]). The evidence adduced at the hearing established that the father had lived with the mother and the children in the Town of Walton, Delaware County until his arrest. Although the record provides little detail as to the nature of his relationship with the children prior to his incarceration, the mother acknowledged that, during such time, he was a "good dad." The prison where the father was incarcerated at the time of the hearing was located approximately 63 miles from the children's home, with a travel time of approximately 1 hour and 20 minutes. Following the father's incarceration, the children regularly visited the father and had daily telephone contact with him until May 2016.[FN2]
With respect to transportation, the mother testified that she did not presently have a valid driver's license, she did not own a motor vehicle, she suffered from seizures and did not otherwise have the financial resources to pay the transportation costs associated with the children's visits to see the father and, therefore, she was not a viable transportation resource. Although the father indicated that the children's paternal grandmother could potentially provide transportation for visitation, the testimony at the combined fact-finding hearing indicated a clear animosity between the mother and the paternal grandmother such that a workable transportation arrangement between the two of them was highly unlikely.
As the father argues, we recognize that recent social science research strongly supports the legal presumption that children benefit from continuing contact with an incarcerated parent (see Nancy G. La Vigne, et al., Broken Bonds: Understanding and Addressing the Needs of Children with Incarcerated Parents, Urban Institute Justice Policy Center, at 10 [2008]). Nonetheless, the best interests of a child, and particularly a young child, may not be served by imposing in-person visits to a correctional facility. The atmosphere and setting of such visits may be traumatic to the child and his or her view of the parent. Other means of contact, such as frequent phone calls and letters, can provide children and incarcerated parents meaningful communication and ways to continue and strengthen their relationships, without subjecting young children to unnecessary distress (see Julie Poehlmann-Tynan, Children's Contact with Incarcerated Parents, Focus [Vol. 32, No. 2], at 13-14 [Fall/Winter 2015-16]; Mary De Masi and Cate Bohn, Children with Incarcerated Parents: A Journey of Children, Caregivers and Parents in New York State, Annie E. Casey Foundation, at 13-14, 17 [2010]).
Here, the children were six and seven years old at the time of the fact-finding hearing, the mother described a history of domestic violence, indicating that it had occurred in front of at least one of the children, and she remained concerned for both her safety and the mental well-being of the children, as she testified that the children were exhibiting behavioral difficulties following contact with the father. The father, meanwhile, is serving a lengthy sentence and is not eligible for release until, at the earliest, 2021. Accordingly, under the circumstances, we find that there is a sound and substantial basis in the record to support Family Court's determination limiting the father to biannual visitation, with weekly telephone contact with the children (see Matter of Lapham v Senecal, 125 AD3d at 1211; Matter of Garraway v Laforet, 68 AD3d 1192, 1193-1194 [2009]; Matter of Moore v Schill, 44 AD3d 1123, 1123 [2007]; Matter of Eck v Eck, 33 AD3d 1082, 1083 [2006]). Importantly, if circumstances subsequently change as the children get older or as the father's release date gets closer such that certain additional visitation might be more appropriate, the father is free to file a modification petition at that time if he so chooses (see generally Matter of Kadio v Volino, 126 AD3d 1253, 1256-1257 [2015]).
Garry, P.J., Aarons and Rumsey, JJ., concur.




Pritzker, J. (concurring in part and dissenting in part).


I agree with the majority that Family Court properly granted visitation to petitioner (hereinafter the father). However, I respectfully dissent, because, unlike the majority, I do not find that there is a sound and substantial basis in the record to support that part of Family Court's order that awarded the father only two visits per year (see Matter of Staff v Gelunas, 143 AD3d 1077, 1077 [2016])[FN3]. The frequency of visitation is subject to an analysis of "the child[ren's] best interests in view of the totality of the circumstances" (Matter of Lapham v Senecal, 125 AD3d 1210, 1210 [2015] [internal quotation marks and citations omitted]; see Matter of Garraway v Laforet, 68 AD3d 1192, 1194 [2009]), which invites consideration of a number of factors. In a case involving an incarcerated parent, some of these factors include, as relevant here, (1) the nature of the parent-child relationship before incarceration, (2) the frequency of the visits that had taken place after incarceration, (3) the children's ages, (4) the distance to the facility, (5) the facility rules regulating visitation, (6) the visitation environment at the facility, including safety concerns, (7) the burden that the visits would place on the custodial parent to transport the children for visits, (8) the children's wishes, according deference to their ages and maturity, (9) the emotional and psychological characteristics of the children and the impact of the visitation upon them, (10) the past and current family dynamic, (11) the nature of the crime and the length of the remaining incarceration, and (12) the parent's behavioral, psychological and emotional state (see e.g. Matter of Lapham v Senecal, 125 AD3d at 1211; Matter of Garraway v Laforet, 68 AD3d at 1193-1194; Matter of McCrone v Parker, 265 AD2d 757, 758 [1999]).
The record reveals that respondent (hereinafter the mother) and the father are married and have raised their two children together since birth — who were ages six and seven at the time of the hearing — until May 2013 when the father was incarcerated for the sale of narcotics. The mother testified that the father, prior to being incarcerated, was always a good parent. The record also reveals that the father maintained a positive relationship with the children after becoming incarcerated. When the father was first incarcerated at Elmira Correctional Facility, the children and the mother visited the father every other day, and, once the father moved to another correctional facility, the children and the mother continued to regularly visit the father multiple times each month for the first three years of his incarceration. Throughout these years, the father spoke to the children and the mother by telephone every couple of days. The father testified that, [*3]even though he was incarcerated, he participated in the children's lives and communicated with their teachers and school principal to monitor their grades and attendance.
In May 2016, however, the visits and telephone contact ceased completely when the mother and the children relocated to California, without informing the father. In July 2016, soon after learning of the relocation, the father filed this pro se petition seeking visitation. The fact-finding hearing did not commence until December 2017, at which time Family Court ordered telephone contact between the father and the children [FN4]. A decision was not rendered until March 8, 2018,[FN5] which ordered the twice-yearly visitation that did not commence until April 2018, nearly two years after the father last saw his children.
The record also reveals that, at the time of the
fact-finding hearing, the father was incarcerated approximately 60 miles away from where the children resided, and the facility did not have any rules or regulations that posed a barrier to visitation. The mother testified that, at prior visits, correction officers were always present and the father had never been reprimanded during a visit. The mother's testimony revealed that she did not own a vehicle, had a suspended driver's license and suffers from a disability that impacts her ability to drive. Although I recognize that transportation appears to present a challenge — even though it did not previously — the record reveals that other arrangements could be made to facilitate visitation (see Matter of Staff v Gelunas, 143 AD3d at 1079 n 4; compare Matter of Coley v Mattice, 136 AD3d 1231, 1232 [2016]).
There was some testimony by the mother that the children were uncomfortable with the visits and that she had concerns for their mental health. Given the lack of expert testimony (compare Matter of Kadio v Volino, 126 AD3d 1253, 1255 [2015]; Matter of Culver v Culver, 82 AD3d 1296, 1298 [2011], appeal dismissed 16 NY3d 884 [2011], lv denied 17 NY3d 710 [2011]), one can infer from the record that these issues were caused, at least in part, by the abrupt termination of the father's visitation, various moves, including to and from California, a new sibling and other chaotic changes that had taken place in the children's lives in the past few years [FN6]. Although the mother testified regarding domestic violence that had occurred between her and the father, the record fails to support the minimal visitation given that the father has taken a domestic violence program in prison and the prior domestic violence did not deter the mother from facilitating liberal visitation during his first three years of incarceration. Also relevant to the analysis of the totality of the circumstances is that the crime for which the father is incarcerated did not involve any untoward conduct involving children (compare Matter of Joshua C. v Yolanda C., 140 AD3d 1213, 1213 [2016]; Matter of Culver v Culver, 82 AD3d at 1296), and his testimony indicated that he could be released as early as August 2021 (compare Matter of Lewis v Lowney, 296 AD2d 624, 624 [2002]).
I also note that a review of our jurisprudence fails to uncover any decision with a similar constellation of factors favoring visitation, yet resulting in such minimal visitation (compare Matter of Dharmamshot v Surita, 150 AD3d 1436 [2017]; Matter of Kadio v Volino, 126 AD3d 1253 [2015]; Matter of Lapham v Senecal, 125 AD3d 1210 [2015]; Matter of Garraway v Laforet, 68 AD3d 1192 [2009]; Matter of Moore v Schill, 44 AD3d 1123 [2007]). Most notably, in Matter of Garraway v Laforet (supra), we affirmed an order that had provided an incarcerated father, who had been convicted of animal fighting and perjury, two visits per year. These visits were found to be in the best interests of the child despite the fact that the record contained proof that the father had subjected the mother to sexual behavior in the presence of the [*4]child and had mailed the child "clearly inappropriate material, such as a photograph of a semi-nude young woman identified as 'your new mommy' and a statement that the child's older brother was not the father's biological son. The letters also contain[ed] numerous derogatory comments about the mother, such as warnings that she would abandon the child, that she was lying to him and 'brainwashing' him, that she intended to drug the child, and that she was mentally ill" (id. at 1194). The father in Garraway testified at the hearing that he saw "nothing inappropriate" in the letters and that he was just telling the child, who was seven years old at the time of trial, the truth (id.). In stark contrast to Garraway, here, there was no evidence indicating that the father's behavioral, psychological or emotional state would negatively impact the children.
Therefore, given the totality of the circumstances, and mindful of our precedent in cases such as these, I find that there is a sound and substantial basis in the record that visitation four times a year is in the best interests of the children (see Matter of Lapham v Senecal, 125 AD3d at 1210). As such, I would modify Family Court's order accordingly. Although not a dramatic increase, given the panoply of conditions impacting the family, this schedule provides meaningful contact with the father, who is trying to preserve his paternal relationship despite his incarceration.
ORDERED that the order is affirmed, without costs.



Footnotes

Footnote 1: The children's paternal grandmother also filed a petition seeking custody and visitation with the children, and, in turn, Family Court conducted a combined fact-finding hearing with regard to both the father's and the grandmother's petitions. Family Court ultimately dismissed the grandmother's custody petition.

Footnote 2: After cutting off contact with the father, the mother briefly moved back to California to live with the maternal grandmother. As of the fact-finding hearing, however, the mother represented that she had moved back to Walton in order to address the subject visitation issues.

Footnote 3: As the majority aptly points out, although Family Court failed to make any factual findings with regard to whether a biannual visitation schedule was in the best interests of the children, the record permits this Court to reach an independent determination on this issue (see Matter of Austin v Smith, 144 AD3d 1467, 1470 [2016]).

Footnote 4: The record reveals that there was a period of time after the relocation when the father did not know where the children were.

Footnote 5: I note that a Lincoln hearing was properly held.

Footnote 6: I note that the children are in counseling, but this counseling did not commence until after the visits were terminated.